UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HADJ GHALEM, and MARTIN FOTH WILLMANN on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>PROGRESS SOFTWARE COMPANY, IPSWITCH, INC. and UMASS CHAN MEDICAL SCHOOL,<br>                    Defendants. | Case No. _____<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Hadj Ghalem, individually and on behalf of all other similarly situated persons, by and through their attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, as and for their class action complaint against Defendants Progress Software Company Ipswitch, Inc. and UMass Chan Medical School, respectfully allege, upon their own knowledge or, where they lack personal knowledge, upon information and belief including the investigation of their counsel, as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs and other Class Members are individuals whose Personally Identifiable Information ("PII") including names, dates of birth, and Social Security numbers were compromised due to Defendants' failure to implement and maintain reasonable safeguards to protect such information in Defendant's custody and control.

2.      This class action seeks to redress Defendants' unlawful and negligent disclosure of Personal Information in a massive data breach which occurred on May 27, 2023 (the "Data Breach" or "Breach"), in violation of state statutory and common law.  During that period, Defendants'

inadequate security measures allowed unauthorized individuals to access Defendants' computer network and obtain a copy of Plaintiffs' and other Class Members' Personal Information.

3.      As a result of the Data Breach, Plaintiffs and Class Members are at a substantially increased risk of identity theft and fraud and have suffered ascertainable losses in the form of the loss of the benefit of the bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

4.      In addition, Plaintiffs' and Class Members' personal information—which was entrusted to Defendants and their officials and agents—was compromised and unlawfully accessed due to the Data Breach.

5.      Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendants' failure to safeguard Plaintiffs' and Class Members' Personal Information that Defendants collected and maintained, and for Defendants' failure to provide timely and adequate notice to Plaintiffs and other Class Members that their Personal Information had been subject to the unauthorized access of an unknown third party.

6.      Defendants maintained the Personal Information in a negligent and/or reckless manner.  In particular, the Personal Information was maintained on Defendants' computer system and network in a condition vulnerable to cyberattacks.  Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Personal Information was a known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to secure the Personal Information from those risks left that property in a dangerous condition and increased the risk of theft.

7.     Plaintiffs' and Class Members' identities are now at risk because of Defendants' negligent conduct because the Personal Information that Defendants collected and maintained is now in the hands of data thieves.

8.     Armed with the Personal Information accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial information in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, and using Class Members' health information to target other phishing and hacking intrusions based on their individual.

9.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of medical and financial fraud and identity theft.  Plaintiffs and Class Members must now and in the future closely monitor their financial accounts and medical information to guard against identity theft.

10.     Plaintiffs and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

11.     By their Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Personal Information was accessed during the Data Breach.

12.     Plaintiffs seek remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief, including improvements to Defendants' data security system, future annual audits, and adequate credit monitoring services funded by Defendants.

13.     Accordingly, Plaintiffs bring this action against Defendants seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of express contract, (iii) breach of implied contract, (iv) unjust enrichment, (v) breach of implied covenant of good faith and fair dealing, (vi) negligent misrepresentation, (vii) invasion of privacy by intrusion, (viii) breach of fiduciary duty, and (ix) breach of confidence.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2).  The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and there are thousands of members of the class that are citizens of states different from Defendant.

15.     This Court has personal jurisdiction over Defendants because they are headquartered in Massachusetts, their principal places of business are in Massachusetts, and they regularly conduct business in Massachusetts.

16.     This Court also has personal jurisdiction over the Defendant Progress Software Company because it is headquartered in and regularly conducts business in Massachusetts.

17.     This Court also has personal jurisdiction over the Defendant Ipsquitch, Inc. because it is headquartered in and regularly conducts business in Massachusetts.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants reside in this District, a substantial part of the events, acts, and omissions giving rise to plaintiffs' claims occurred in, was directed to, and/or emanated from this District, Defendants are based in this District, Defendants maintain customers' Private Information in the District, and Defendants have caused harm to Plaintiffs and Class Members residing in this District.

## THE PARTIES

19.    Plaintiff Hadj Ghalem is a Massachusetts resident residing in Melrose, Middlesex County, Massachusetts.

20.    In order to receive medical insurance services from the medical school UMass Chan for his son, Plaintiff Ghalem had to provide his Personal Information, as well as the Personal Information of his wife and two sons, to Defendants.

21.    Plaintiff Martin Foth Willmann is an Oregon resident residing in Portland, Multnomah County, Oregon.

22.    In order to receive banking services from Umpqua Bank, his personal bank, Plaintiff Willmann had to provide his Personal Information to Defendants.

23.    Plaintiffs trusted that Defendants would use reasonable measures to protect their information, including complying with state law.

24.    Plaintiffs suffered actual injury in the form of damages to and diminution of the value of their Personal Information—which they entrusted to Defendants and which was compromised in the Data Breach.

25.    Plaintiffs suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse from their Personal Information being accessed and exfiltrated by hackers.  This injury was exacerbated by Defendants' delay in revealing the Data Breach.

26.    Plaintiff Ghalem has received more spam calls since the Data Breach, and has experienced increased agitation and stress as a result of the breach.

27.    Plaintiff Willmann's information was used in an attempt to open an online Chime Bank account in his name using his email and social security number.  He has spent significant

time with his own bank and the FTC reporting this fraud and ensuring his information is secure. He has received more spam calls since the Data Breach, and has experienced increased agitation and stress as a result of the breach.

28.     Plaintiffs have a continuing interest in ensuring that their Personal Information, which remains with Defendant, is protected and safeguarded from future breaches.

29.     Defendant Progress Software Company is a Massachusetts corporation with its principal address located at 84 State Street, Boston, MA, 02109.

30.     Defendant Ipswitch, Inc. is a Massachusetts corporation with its principal address located at 15 Wayside Road, Fourth Floor, Burlington, MA 01803.

31.     Defendant UMass Chan is a Massachusetts state university with its principal address located at 55 Lake Avenue North, Worcester, MA 01655.

## FACTUAL ALLEGATIONS

### A.     Defendants' Collection Of Personal Information.

32.     Defendants obtain Class Members' Personal Information when customers register to receive services.  This Personal Information includes, upon information and belief:

    a.     Contact information;

    b.     Authentication information such as driver's licenses and Social Security Numbers.

33.     Obtaining this information is a precondition of receiving services from Defendants.

34.     As a result, Defendants' systems store the PII and PHI of thousands of customers who have received their insurance services.

**B.    The Data Breach.**

35.    Defendants Progress Software and Ipswitch, Inc., produce and distribute MoveIt, a "[m]anaged File Transfer and automation software that guarantees the security of sensitive files both at-rest and in-transit, ensures reliable business processes and addresses data security compliance requirements."[1]

36.    On May 27, 2023 and May 30, 2023, the systems that Defendants use to store the private information on MoveIt were accessed by unauthorized third-party hackers, who exfiltrated Plaintiffs' and Class Members' sensitive Personal Information—including, *inter alia*, their names, contact information and Social Security numbers.[2]  The breach potentially affected millions of individuals, including Umpqua Bank and UMass Chan patrons.[3]

37.    Both Plaintiff Willmann and Plaintiff Ghalem were notified by Umpqua Bank and Defendant UMass Chan that their social security numbers and other personal information was breached.[4]

**C.    Defendants Failed to Safeguard Customers' Information.**

38.    Defendants failed to exercise reasonable care in protecting customers' Personal Information.

39.    Defendants have a non-delegable duty under Massachusetts and Oregon law to ensure that all information they collect and store is secure, and that any associated entities with

---

[1] *See* Progress Software, corporate brochure, progress-corporate-brochure-2023-rgb.pdf (d117h1jjiq768j.cloudfront.net) (last accessed August 24, 2023).

[2] *See* United States Cybersecurity and Infrastructure Security Agency, *#StopRansomware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit Vulnerability*, available at https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a

[3] *See* CBS New Boston, *Massachusetts says 134,000 were affected by UMass Chan data breach*, available at https://www.cbsnews.com/boston/news/umass-chan-data-breach-massachusetts-moveit/; KGW8 News, *Umpqua Bank Confirms it was impacted by same global cyberattack that included Oregon DMV*, available at Umpqua Bank among victims in global hack that also hit Oregon DMV | kgw.com.

[4] *See* Data Security Incident Notice to Plaintiff Willmann (Ex. 1); Data Security Incident Notice to Plaintiff Ghalem (Ex. 2).

whom they shared information maintain adequate and commercially reasonable data security practices to ensure the protection of customers' Personal Information.

40.     Defendants know or should know that their customers must trust that they are keeping their Personal Information private and secure.  As Defendant Progress Software's website states, Progress is "committed to protecting the privacy of individuals who visit the Company's web sites, individuals who register to use our services, and individuals who register to attend the Company's corporate events."[5]

41.     Umpqua Bank's privacy policy notes: "[w]e use reasonable physical, electronic, and procedural safeguards that comply with federal standards to protect and limit access to personal information. This includes device safeguards and secured files and buildings."[6]

42.     UMass Chan's privacy policy notes: "UMass Chan is committed to protecting the information that is critical to teaching, research, the Medical School's many varied activities, our business operation (ForHealth), and the communities we support, including students, faculty, staff members, and the public."[7]

43.     If Defendants' customers lacked trust in them or knew they would insecurely store, safeguard, or transmit their personal information, then they would not disclose health information to Defendants and instead choose a different provider for services.

44.     More specifically, to provide services to customers, Defendants must keep those customers' Personal Information private and secure.  If their customers lacked trust in Defendants or knew Defendants would insecurely store, safeguard, or transmit their personal information or

---

[5] *See* Progress Software's privacy policy, available at https://www.progress.com/legal/privacy-policy.
[6] *See* Umpqua Bank's privacy policy, available at https://www.umpquabank.com/privacy/.
[7] *See* UMass Chan's privacy notice, available at
https://www.umassmed.edu/globalassets/it/documents/policies/information-security-policy.pdf

fail to establish or follow data security policies and protocols, insured parties would not disclose health information to Defendants and would choose a different provider.

**D.    Defendants Violated Massachusetts and Federal Law's Requirements to Safeguard Data.**

45.    Each Defendant "owns or licenses personal information about a resident of the Common-wealth" and was thus required under Massachusetts Law to "develop, implement, and maintain a comprehensive information security program that is written in one or more readily accessible parts and contains administrative, technical, and physical safeguards that are appropriate to . . . the need for security and confidentiality of both consumer and employee information." 201 CMR 17.03.

46.    Defendants failed to maintain the privacy and security of their customers' Personal Information and failed to inform customers that their PII and PHI was disclosed. Indeed, Defendants violated Massachusetts Law by failing to:

a.    Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Adequately protect Plaintiffs' and Class Members' Personal Information.

47.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

48.    The HIPAA Breach Notification Rule, 45 CFR §§164.400-414, also required Defendants to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of a breach.

49.     Based on information and belief, Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.  Defendants' security failures include, but are not limited to, the following:

a.  Failing to ensure the confidentiality and integrity of electronic protected health information that Defendants create, receive, maintain, and transmit in violation of 45 C.F.R. §164.306(a)(1);

b.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

d.  Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f.  Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g.  Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h.  Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, et seq.;

i.  Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

50.    Defendants were also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

51.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices.  According to the FTC, the need for data security should be factored into all business decision-making.[8]

---

[8] *Start With Security: A Guide for Business*, FED. TRADE COMM'N, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 26, 2023).

52.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[9]  The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

53.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

54.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55.    Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.

---

[9] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION ,available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf  (last visited May 26, 2023).

56.     Defendants were at all times fully aware of its obligation to protect the Private Information of their customers because of its position as a trusted healthcare provider.  Defendants were also aware of the significant repercussions that would result from its failure to do so.

57.     Defendants were fully aware of their obligations to implement and use reasonable measures to protect the Personal Information provided to them by their customers but failed to comply with basic guidelines that would have prevented the Data Breach from occurring.

**E.     Plaintiffs' and Class Members' Personal Information Is Highly Valuable.**

58.     Defendants were or should have been aware that they were collecting highly valuable data, for which Defendants knew or should have known there is an upward trend in data breaches in recent years.

59.     As early as 2014, the FBI alerted the healthcare industry that they were an increasingly preferred target of threat actors, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)" so that these companies can take the necessary precautions to thwart such attacks.[10]

60.     Further, Cathy Allen, CEO of Shared Assessments, a cyber-risk management group, stated that "just the types of test proscribed might indicate a type of illness that you would not want employers or insurance companies to have. Thieves often steal and resell insurance data on the internet . . . having other information makes the data more valuable and the price higher." [11]  Personal Information is a valuable commodity to identity thieves. Compromised Personal Information is traded on the "cyber black-market."  As a result of recent large-scale data breaches,

---

[10] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS, Aug. 20, 2014, http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820     (last accessed Feb. 28, 2023).
[11] *Id.*

identity thieves and cyber criminals have openly posted stolen credit card numbers, Social Security numbers and other Personal Information directly on various dark web[12] sites making the information publicly available. [13]

61.  Healthcare data is especially valuable on the black market.  According to one report, a healthcare data record may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card). [14]

62.  According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information" which fraudsters commonly use "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers." [15]

63.  According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an

---

[12] The dark web refers to encrypted content online that cannot be found using conventional search engines and can only be accessed through specific browsers and software. MacKenzie Sigalos, *The dark web and how to access it* (Apr. 14, 2018), https://www.cnbc.com/2018/04/13/the-dark-web-and-how-to-access-it.html (last accessed Feb. 28, 2023).
[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Feb. 28, 2023); McFarland et al., *The Hidden Data Economy*, at 3, https://www.scribd.com/document/514735648/rp-hidden-data-economy (last accessed Feb. 28, 2023).
[14] *Hackers, Breaches, and the Value of Healthcare Data* (June 20, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers/ (last accessed Feb. 28, 2023).
[15] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters, https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last accessed Feb. 28, 2023).

individual." [16]  For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[17]

64.     As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies: "The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans." [18]

### F.     Defendants Harmed Plaintiffs and Class Members By Allowing Criminals to Access Their Information.

65.     Defendants knew or should have known both that medical information is incredibly valuable to threat actors and that healthcare data breaches are on the rise.  Accordingly, Defendants were on notice for the harms that could ensue if they failed to protect customers' Personal Information.

---

[16]Andrew     Steger,     *What     Happens     to     Stolen     Healthcare     Data?*     (Oct.     30,     2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed Feb. 28, 2023).
[17]  Paul Nadrag, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017),     https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Feb. 28, 2023).
[18] *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited Feb. 28, 2023).

66.     Given the private and valuable nature of the Personal Information stolen in the Data Breach—including Social Security number, date of birth, driver's license number, financial account information, health insurance policy number, Medical Record Number, Medicaid or Medicare ID, and health information such as treatment and diagnosis info—threat actors have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future.

67.     Plaintiffs and Class Members, the victims of the Data Breach, have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm. As detailed above, hackers were able to totally compromise Defendants' system.

68.     The PII and PHI exposed in the Data Breach is highly coveted and valuable on underground or black markets.

69.     Identity thieves can use the stolen information to: (a) create fake credit cards that can be swiped and used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of

other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.  Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail, extortion, and other negative effects.

70.    While federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity.  According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[19]  Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%).  Only 14% of respondents said that the identity thieves used the information to obtain fraudulent credit accounts, indicating that medical information is a much more profitable market.[20]

71.    According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[21]

72.    Additionally, the study found that medical identity theft can have a negative impact on reputation as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[22]

---

[19]    *Ponemon Institute*, *Fifth Annual Study on Medical Identity Theft*, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last accessed Feb. 28, 2023).
[20]    *Id*. at 9.
[21]    *Id*. at 2.
[22]    *Id*. at 14.

73.     Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[23]  In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records.  Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[24]

74.     Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements.  For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;

- Get contacted by a debt collector about medical debt they do not owe;

- See medical collection notices on their credit report that they do not recognize;

- Find erroneous listings of office visits or treatments on their explanation of benefits;

- Receive information from their health plan that they have reached their limit on benefits; or

- Be denied insurance because their medical records show a condition they do not have.[25]

---

[23] *Id*. at 1.

[24] *Id*.

[25] *FTC, Medical Identity Theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last accessed Feb. 28, 2023).

75.    Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[26] According to Tom Kellermann, "Traditional criminals understand the power of coercion and extortion. By having healthcare information— specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[27]  Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

76.    As explained further by the FTC, medical identity theft can have other serious consequences:

> Medical ID thieves may use your identity to get treatment – even surgery – or to bilk insurers by making fake claims. Repairing damage to your good name and credit record can be difficult enough, but medical ID theft can have other serious consequences. If a scammer gets treatment in your name, that person's health problems could become a part of your medical record. It could affect your ability to get medical care and insurance benefits, and could even affect decisions made by doctors treating you later on. The scammer's unpaid medical debts also could end up on your credit report.[28]

77.    As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

    a.    losing the inherent value of their Personal Information;

---

[26]    Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed Feb. 28, 2023).
[27]    *Id.*
[28]    *Medical ID Theft: Health Information for Older People*, Federal Trade Commission, https://web.archive.org/web/20201019075254/https://www.consumer.ftc.gov/articles/0326-medical-id-theft-health-information-older-people (last accessed Feb. 28, 2023).

b.      identity theft and fraud resulting from the theft of their Personal
        Information;

c.      costs associated with the detection and prevention of identity theft and
        unauthorized use of their financial accounts;

d.      costs associated with purchasing credit monitoring, credit freezes, and
        identity theft protection services;

e.      unauthorized charges and loss of use of and access to their financial
        account funds and costs associated with inability to obtain money from
        their accounts or being limited in the amount of money they were
        permitted to obtain from their accounts, including missed payments on
        bills and loans, late charges and fees, and adverse effects on their credit;

f.      lowered credit scores resulting from credit inquiries following fraudulent
        activities;

g.      costs associated with time spent and the loss of productivity or the
        enjoyment of one's life from taking time to address and attempt to
        mitigate and address the actual and future consequences of the Data
        Breach, including discovering fraudulent charges, cancelling and reissuing
        cards, purchasing credit monitoring and identity theft protection services,
        imposing withdrawal and purchase limits on compromised accounts; and

h.      the continued imminent and certainly impending injury flowing from
        potential fraud and identify theft posed by their Personal Information
        being in the possession of one or many unauthorized third parties.

78.     Even in instances where a consumer is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement that is not refunded. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[29]

79.     There may also be a significant time lag between when personal information is stolen and when it is actually misused.  According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[30]

80.     Plaintiffs and Class Members place significant value in data security.  According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a

---

[29] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last accessed Feb. 28, 2023).
[30] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent Is Unknown* (2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Feb. 28, 2023).

provider that has better data security.  Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[31]

81.     Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not.  Indeed, if consumers did not value their data security and privacy, Defendants would have no reason to tout their data security efforts to their actual and potential customers.

82.     Consequently, had consumers known the truth about Defendants' data security practices—that they did not adequately protect and store their Personal Information—they would not have entrusted their Personal Information to Defendants.

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

> All natural persons residing in the United States whose PII was compromised in the Data Breach.

84.     The Nationwide Class asserts claims against Defendants for negligence (Count 1), breach of express contract (Count 2), breach of implied contract (Count 3), unjust enrichment (Count 4), breach of implied covenant of good faith and fair dealing (Count 5), negligent misrepresentation (Count 6), invasion of privacy by intrusion (Count 7), breach of fiduciary duty (Count 8), and breach of confidence (Count 9).

85.     Excluded from the Class are Defendants, any entity in which any Defendant has a controlling interest, and any Defendant's officers, directors, legal representatives, successors,

---

[31] Jeff Goldman, eSecurity Planet, *52 Percent of Consumers Would Pay More for Products or Services with Better Data Security* (May 19, 2016) https://www.esecurityplanet.com/networks/consumers-would-pay-more-for-products-or-services-with-better-data-security/ (last visited Feb. 28, 2023).

subsidiaries, and assigns.  Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

86.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

87.     This action satisfies the requirements for a class action under F.R.C.P. 23(a)(1) - (a)(4), including requirements of numerosity, commonality, typicality, and adequacy of representation.

88.     This action satisfies the requirements for a class action under Rule 23(a)(1). Plaintiffs believe that the proposed Class as described above consists of at least hundreds of covered individuals and can be identified through Defendants' records, though the exact number and identities of Class Members are currently unknown.  The Class is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

89.     This action satisfies the requirements for a class action under Rule 23(a)(2). Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class Members.  Common questions include, but are not limited to, the following:

       a.     Whether Defendants had a duty to protect the Personal Information;

       b.     Whether Defendants failed to take reasonable and prudent security measures;

       c.     Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices;

       d.     Whether Defendants' security measures to protect their systems were reasonable in light of known legal requirements;

e.   Whether Defendants' efforts (or lack thereof) to ensure the security of customers' Personal Information were reasonable in light of known legal requirements;

f.   Whether Defendants' conduct constituted unfair or deceptive trade practices;

g.   Whether Defendants violated state law when they failed to implement reasonable security procedures and practices;

h.   Which security procedures and notification procedures Defendants should be required to implement;

i.   Whether Defendants violated state consumer protection and data breach statutes in connection with the actions described herein;

j.   Whether Defendants failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the data breach was discovered;

k.   Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach and/or the loss of the Personal Information of Plaintiffs and Class Members;

l.   Whether Plaintiffs and Class Members were injured and suffered damages or other losses because of Defendants' failure to reasonably protect their Personal Information; and

m.   Whether Plaintiffs and Class Members are entitled to damages or injunctive relief.

90.   This action satisfies the requirements for a class action under Rule 23(a)(3).  The claims asserted by Plaintiffs are typical of the claims of the members of the Class they seek to

represent because, among other things, Plaintiffs and Class Members sustained similar injuries as a result of Defendants' uniform wrongful conduct; Defendants owed the same duty to each class member; and Class Members' legal claims arise from the same conduct by Defendants.

91.     This action satisfies the requirements for a class action under Rule 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have no interests conflicting with the interests of Class Members.  Plaintiffs' Counsel are competent and experienced in data breach class action litigation.

92.     This action satisfies the requirements for a class action under Rule 23(b)(3).  The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.  Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations, like Defendant.  Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

93.     The nature of this action and the nature of laws available to Plaintiffs and the Classes make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Classes for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each of the Class Members with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be

recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

94.    The litigation of the claims brought herein is manageable.  Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class and Sub-class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

95.    This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendants or would be dispositive of the interests of members of the proposed Class.

96.    The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class.  The Class consists of individuals who received services and whose information was supplied to Defendants.  Class members can be determined using Defendants' records in its databases, which is presumably also how Defendants were able to provide notice of breach letters to Plaintiffs and Class Members.

97.    Unless a Class-wide injunction is issued, Plaintiffs and Class Members remain at risk that Defendants will continue to fail to properly secure the Private Information of Plaintiffs and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

98.    Defendants have acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Classes as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Negligence**

99.    Plaintiffs repeat the allegations contained in the preceding paragraphs as if fully set forth herein.

100.    Defendants require any individual that uses their services to submit their Personal Information to Defendants.  Defendants collect and store this Personal Information as a part of their regular business activities, and for their own pecuniary gain.

101.    Defendants had a non-delegable duty to maintain adequate and commercially reasonable data security practices to ensure the protection of customers' Personal Information.

102.    Defendants knew or should have known that their systems were vulnerable to unauthorized access and exfiltration by third parties.

103.    Defendants owed a duty of care to Plaintiffs and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks adequately protected the Personal Information.

104.    Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and Class Members.  The special relationship arose because Plaintiffs and Class Members entrusted Defendants with their confidential data as part of the health treatment process.  Only Defendants were in a position to ensure that they had sufficient safeguards to protect against the harm to Plaintiffs and Class Members that would result from a data breach.

27

105.    Defendants' duty to use reasonable care in protecting Personal Information arose as a result of the common law and the statutes, as well as their own promises regarding privacy and data security to customers.  This duty exists because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices.  By collecting and maintaining personal and confidential information of Plaintiffs and Class Members and acknowledging that this information needed to be kept secure, it was foreseeable that they would be harmed in the future if Defendants did not protect Plaintiffs' and Class Members' information from threat actors.

106.    Defendants' duties also arose under Massachusetts Law which, as described above, applied to Defendants and required Defendants to "develop, implement, and maintain a comprehensive information security program that is written in one or more readily accessible parts and contains administrative, technical, and physical safeguards that are appropriate to . . . the need for security and confidentiality of both consumer and employee information."  201 CMR 17.03. The confidential data at issue in this case constitutes "consumer . . . information" within the meaning of 201 CMR 17.03.

107.    Defendants knew or should have known, of the risks inherent in collecting and storing Personal Information, the vulnerabilities of its systems, and the importance of adequate security.

108.    Defendants breached their common law, statutory, and other duties – and thus was negligent – by failing to use reasonable measures to protect customers' Personal Information.

109.    Defendants breached their duties to Plaintiffs and Class Members in numerous ways, including by:

a.  Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiffs' and Class Members' Personal Information;

b.  Failing to comply with industry-standard data security standards during the period of the Data Breach;

c.  Failing to adequately monitor, evaluate, and ensure the security of Plaintiffs' network and systems; and

d.  Failing to recognize in a timely manner that Plaintiffs' and other Class Members' Personal Information had been compromised.

110.  Plaintiffs' and Class Members' Personal Information would not have been compromised but for Defendants' wrongful and negligent breach of their duties.

111.  Defendants' failure to take proper security measures to protect sensitive Personal Information of Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiffs' and Class Members' Personal Information.

112.  It was also foreseeable that Defendants' failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiffs and Class Members as described in this Complaint.

113.  Neither Plaintiffs nor the other Class Members contributed to the Data Breach and subsequent misuse of their Personal Information.

114.  As a direct and proximate cause of Defendants' conduct, Plaintiffs and Class Members suffered damages and will suffer damages including, but not limited to: damages arising from identity theft or fraud; damages from lost time and effort to mitigate the actual and potential

impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take years to discover and detect; and loss of the value of their privacy and confidentiality of the stolen confidential data, including health data.

## SECOND CAUSE OF ACTION
### Breach Of Express Contract

115.   Plaintiffs re-allege and incorporates by reference the preceding paragraphs as if fully set forth herein.

116.   Plaintiffs and Class Members entered into written agreements with Defendants as part of the insurance services Defendants provided to Plaintiffs and Class Members. The agreements involved a mutual exchange of consideration whereby Defendants provided these services in exchange for payment from Class Members.

117.   Plaintiffs and Class Members paid Defendants for their services and performed under these agreements.

118.   Defendants' failure to protect Plaintiffs' and Class Members' Personal Information constitutes a material breach of the terms of these agreements by Defendants.

119.   As a direct and proximate result of Defendants' breaches of express contract, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Breach Of Implied Contract

120.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

121.    Plaintiffs and Class Members were required to provide their Personal Information to the Defendants as a condition of their use of their services.

122.    Plaintiffs and Class Members paid money to the Defendants in exchange for services, along with the Defendants' promise to protect their Personal Information from unauthorized access and disclosure.  Defendants' privacy policy is clear that is ""committed to protecting the privacy of individuals who visit the Company's web sites, individuals who register to use our services, and individuals who register to attend the Company's corporate events."[32]

123.    Implicit in the agreement between Plaintiffs and Class Members and the Defendants to provide Personal Information was Defendants' obligation to: (a) use such Personal Information for business purposes only, (b) take reasonable steps to safeguard that Personal Information, (c) prevent unauthorized disclosures of the Personal Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Personal Information, (e) reasonably safeguard and protect the Personal Information of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the Personal Information only under conditions that kept such information secure and confidential.

124.    When Plaintiffs and Class Members provided their PII and PHI to the Defendants, they entered into implied contracts with the Defendants, pursuant to which Defendants agreed to reasonably protect such information.

125.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and were consistent with industry standards.

---

[32] *See* Progress Software's privacy policy, available at https://www.progress.com/legal/privacy-policy.

126.    Defendants' failure to safeguard the data in its care represents a breach of its implicit agreement with Plaintiffs and the Class.

127.    Plaintiffs and Class Members seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment

128.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

129.    For years and continuing to today, Defendants' business models depended upon customers entrusting them with their Personal Information.  Trust and confidence are critical and central to both the services provided by Defendants to customers.

130.    Unbeknownst to Plaintiffs and Class Members, however, Defendants failed to reasonably or adequately secure, safeguard, and otherwise protect Plaintiffs' and Class Members' Personal Information.  Defendants' deficiencies described herein were contrary to its security messaging.

131.    Plaintiffs and Class Members engaged Defendants for services and provided Defendants with, and allowed Defendants to collect, their Personal Information on the mistaken belief that Defendants complied with their duty to safeguard and protect customers' Personal Information.  Defendants knew that the manner in which they maintained and transmitted customers' Personal Information violated their fundamental duties to Plaintiffs and Class Members by disregarding industry-standard security protocols to ensure confidential information was securely transmitted and stored.

132.    Defendants had within their exclusive knowledge at all relevant times the fact that they had failed to implement adequate security measures to keep customers' Personal Information secure.  This information was not available to Plaintiff, Class Members, or the public at large.

133.    Defendants also knew that Plaintiffs and Class Members expected that their information would be kept secure against known security risks vetted before they received customers' Personal Information.  And based on this expectation and trust, Defendants knew that Plaintiffs and Class Members would not have disclosed Personal Information to them.

134.    Plaintiffs and Class Members did not expect that Defendants would store or transmit their Personal Information insecurely.

135.    Had Plaintiffs and Class Members known about Defendants' deficient security practices, Plaintiffs and Class Members would not have engaged Defendants to perform any services and would never have provided Defendants with their Personal Information.

136.    By withholding these material facts, Defendants put their own interests ahead of their customers' interests and benefited themselves to the detriment of Plaintiffs and Class Members.

137.    As a result of their conduct as alleged herein, Defendants sold more services than they otherwise would have and were able to charge Plaintiffs and Class Members when they otherwise could not have.  Defendants were unjustly enriched by charging and collecting for those services to the detriment of Plaintiffs and Class Members.

138.    To be sure, this is not a question of whether Defendants misused customers' Personal Information.  It is more foundational.  Defendants promised to protect and safeguard Plaintiffs' and Class Members' Personal Information at all times (from the inception of their

relationship of trust and confidence) and never would have performed any services of value enabling them to bill or collect payment but for Defendants' unfair and deceptive practices.

139.    It would be inequitable, unfair, and unjust for Defendants to retain these wrongfully obtained benefits.    Defendants' retention of wrongfully obtained monies would violate fundamental principles of justice, equity, and good conscience.

140.    Defendants' defective security and their unfair and deceptive conduct have, among other things, caused Plaintiffs and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their private Personal Information.

141.    Plaintiffs and members of the proposed Class are entitled to restitution and non-restitutionary disgorgement in the amount by which Defendants were unjustly enriched, to be determined at trial.  Plaintiffs and Class Members seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

<div align="center">

**FIFTH CAUSE OF ACTION**
**Breach Of Implied Covenant Of Good Faith And Fair Dealing**

</div>

142.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

143.    Plaintiffs and Class Members entered into valid, binding, and enforceable express or implied contracts with Defendants, as alleged above.

144.    These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual obligations (both explicit and fairly implied) and not to impair the rights of the other parties to receive the rights, benefits, and reasonable expectations under the contracts.  These included the implied covenants that Defendants would act fairly and in good faith in carrying out its contractual

obligations to take reasonable measures to protect Plaintiffs' and Class Members' Personal Information and to comply with industry standards and federal and state laws and regulations.

145.    A "special relationship" exists between Defendants and the Plaintiffs and Class Members.  Defendants entered into a "special relationship" with Plaintiffs and Class Members who sought insurance services from Defendants and, in doing so, entrusted Defendants, pursuant to their requirements, with their Personal Information.

146.    Despite this special relationship with Plaintiff, Defendants did not act in good faith and with fair dealing to protect Plaintiffs' and Class Members' Personal Information.

147.    Plaintiffs and Class Members performed all conditions, covenants, obligations, and promises owed to Defendants.

148.    Defendants' failure to act in good faith in implementing the security measures required by the contracts denied Plaintiffs and Class Members the full benefit of their bargain, and instead they received insurance and related services that were less valuable than what they paid for and less valuable than their reasonable expectations under the contracts. Plaintiffs and Class Members were damaged in an amount at least equal to this overpayment.

149.    Defendants' failure to act in good faith in implementing the security measures required by the contracts also caused Plaintiffs and Class Members to suffer actual damages resulting from the theft of their Personal Information and remain at imminent risk of suffering additional damages in the future.

150.    Accordingly, Plaintiffs and Class Members have been injured as a result of Defendants' breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation

151.  Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

152.  Defendants negligently and recklessly misrepresented material facts, pertaining to the provision of services, to Plaintiffs and Class Members by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Plaintiffs' and Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft.

153.  Defendants negligently and recklessly misrepresented material facts pertaining to the provision of services to Plaintiffs and Class Members by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiffs' and Class Members' Personal Information.

154.  Defendants either knew or should have known that their representations were not true.

155.  In reliance upon these misrepresentations, Plaintiffs and Class Members obtained services from Defendants.

156.  Had Plaintiffs and Class Members, as reasonable persons, known of Defendants' inadequate data privacy and security practices, or that Defendants were failing to comply with the requirements of federal and state laws pertaining to the privacy and security of Plaintiffs' and Class Members' Personal Information, they would not have purchased health services from Defendants, and would not have entrusted their Personal Information to Defendants.

157.  As a direct and proximate consequence of Defendants' negligent misrepresentations, Plaintiffs and Class Members have suffered the injuries alleged above.

## SEVENTH CAUSE OF ACTION
## Invasion Of Privacy By Intrusion

158.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

159.   Plaintiffs and Class Members had a reasonable expectation that Defendants would maintain the privacy of the Personal Information that Defendants collected and maintained.

160.   Defendants represented to Plaintiffs and Class Members that they would not disclose their Personal Information except in a handful of clearly defined and disclosed circumstances.

161.   Despite representations to the contrary, Defendants failed to protect and safeguard the Personal Information entrusted to them by Plaintiffs and Class Members and in so doing intruded on the private and personal affairs of Plaintiffs and Class Members in a manner highly offensive to a reasonable person; invaded the privacy of Plaintiffs and Class Members by disclosing, without authorization, the Personal Information of Plaintiffs and Class Members, inconsistent with both the purpose of the collection of the Personal Information and inconsistent with the uses of said Personal Information previously disclosed to Plaintiffs and Class Members; failed to provide sufficient security to protect the Personal Information of Plaintiffs and Class Members from unauthorized access; and enabled, by failing to protect it sufficiently, the disclosure of Personal Information without the consent of Plaintiffs or Class Members.

162.   Defendants knew, or acted with reckless disregard in not knowing, that the Personal Information collected from Plaintiffs and Class Members was, because of its nature, subject to a significant risk of unauthorized access.

163.   Defendants knew, or acted with reckless disregard in not knowing, that a reasonable person would consider its failure to adequately protect and secure their Personal Information to be highly offensive.

164.   Defendants' disclosure of Plaintiffs' and Class Members' Personal Information without their consent constituted a violation of the privacy of Plaintiffs and Class Members.

165.   Defendants' failure to provide sufficient security to protect the Personal Information of Plaintiffs and Class Members, leading to unauthorized access to that data by unauthorized parties constituted the unlawful publication of that Personal Information by Defendants.

166.   The Personal Information disclosed in the Data Breach was not generally known to the public and is not a matter of legitimate public concern.

167.   Plaintiffs and Class Members had a reasonable expectation of the privacy of the Personal Information that they provided to Defendants.  That reasonable expectation was thwarted by Defendants' actions and inactions and Defendants' conduct constituted an invasion of Plaintiffs' and Class Members' privacy.

168.   As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial as well as restitution and injunctive relief.

**EIGHTH CAUSE OF ACTION**
**Breach Of Fiduciary Duty**

169.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

170.   In providing their Personal Information to Defendants, Plaintiffs and Class Members justifiably placed special confidence in Defendants to act in good faith and with due

regard to the interests of Plaintiffs and Class Members in order to safeguard and keep confidential their Personal Information.

171.   Defendants accepted the special confidence placed in them by Plaintiffs and Class Members, as evidenced by its assertion stated above in their privacy notices and policies.  There was understanding between the parties that Defendants would act for the benefit of Plaintiffs and Class Members in preserving the confidentiality of the Personal Information.

172.   In light of the special relationship between Defendants, Plaintiff, and the Class Members, whereby Defendants became the guardian of Plaintiffs' and the Class Members' Personal Information, Defendants accepted a fiduciary duty to act primarily for the benefit of its employees, including Plaintiffs and Class Members.  This duty included safeguarding Plaintiffs' and the Class Members' Personal Information.

173.   Defendants' acceptance and storage of Plaintiffs' and Class Members' PII and PHI created a fiduciary relationship between Defendants, on one hand, and Plaintiffs and Class Members, on the other.  As fiduciaries of Plaintiffs and Class Members, Defendants had a duty to act primarily for the benefit of their customers and health plan participants, which includes implementing reasonable, adequate, and statutorily compliant safeguards to protect Plaintiffs' and Class Members' PII and PHI.

174.   Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of its computer systems containing Plaintiffs' and Class Members' Personal Information.

175.   Defendants breached their fiduciary duty by failing to ensure that confidentiality and integrity of electronic Personal Information Defendants created, received, maintained, and transmitted.

176.    Defendants breached their fiduciary duties by failing to implement technical policies and procedures for electronic information systems that maintain electronic Personal Information to allow access only to those persons or software programs that have been granted access rights.

177.    Defendants breached their fiduciary duties by failing to implement policies and procedures to prevent, detect, contain, and correct security violations.

178.    Defendants breached their fiduciary duties by failing to identify and respond to suspected or known security incidents and to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity.

179.    Defendants breached their fiduciary duties by impermissibly and improperly using and disclosing Personal Information that is and remains accessible to unauthorized persons.

180.    Defendants breached their fiduciary duties by failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PII.

181.    Defendants breached their fiduciary duties by otherwise failing to safeguard Plaintiffs' and the Class Members' Personal Information.

182.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching

how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Personal Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

183.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

<div align="center">

**NINTH CAUSE OF ACTION**
**Breach Of Confidence**

</div>

184.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

185.    At all times during Plaintiffs' and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiffs' and the Class Members' Personal Information that Plaintiffs and Class Members provided to Defendants.

186.    As alleged herein and above, Defendants' relationship with Plaintiffs and Class Members was governed by terms and expectations that Plaintiffs' and Class Members' Personal Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

187.    Plaintiffs and Class Members receiving insurance services from Defendants provided Plaintiffs' and the Class Members' Private Information to Defendants with the explicit and implicit understandings that Defendants would protect and not permit the Personal Information to be disseminated to any unauthorized third parties.

188.    Plaintiffs and Class Members receiving services from Defendants also provided Plaintiffs' and Class Members' Personal Information to Defendants with the explicit and implicit understandings that Defendants would take precautions to protect that Personal Information from unauthorized disclosure.

189.    Defendants voluntarily received in confidence Plaintiffs' and Class Members' Personal Information with the understanding that information would not be disclosed or disseminated to the public or any unauthorized third parties.

190.    Due to Defendants' failure to prevent and avoid the Data Breach from occurring, Plaintiffs' and Class Members' Personal Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and the Class Members' confidence, and without their express permission.

191.    As a direct and proximate cause of Defendants' actions and/or omissions, Plaintiffs and Class Members have suffered damages.

192.    But for Defendants' disclosure of Plaintiffs' and Class Members' Personal Information in violation of the parties' understanding of confidence, their Personal Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendants' Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' Personal Information as well as the resulting damages.

193.    The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiffs' and Class Members' Personal Information.  Defendants knew or should have known their methods of accepting and storing Plaintiffs' and Class Members' Personal Information was inadequate as it relates to, at the

very least, securing servers and other equipment containing Plaintiffs' and Class Members' Personal Information.

194.   As a direct and proximate result of Defendants' breach of its confidence with Plaintiffs and Class Members, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to decide how their Personal Information is used; (iii) the compromise, publication, and/or theft of their Personal Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Personal Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk of exposure to their Personal Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Personal Information of current and former customers; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Personal Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

195.   As a direct and proximate result of Defendants' breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**TENTH CAUSE OF ACTION**
**Violation of the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch.
93A, §§1, et seq.**

196.    Plaintiffs repeat and reallege all allegations set forth above as if they were fully set
forth herein.

197.    Defendant is a "person" as defined by the Massachusetts Consumer Protection Act,
MASS. GEN. LAWS ch. 93A, §1.

198.    Defendants are engaged in "trade" or "commerce" defined as advertising, the
offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property,
tangible or intangible, real, personal or mixed, any security and any contract of sale of a commodity
for future delivery, and any other article, commodity, or thing of value wherever situated.

199.    Defendants are engaged in trade or commerce that directly or indirectly affects the
people of the Commonwealth of Massachusetts.

200.    Defendants have engaged in unfair or deceptive acts or practices in the conduct of
trade or commerce.

201.    Defendants misrepresented that they would keep the Private Information of
Plaintiffs and Class Members secure, private, and confidential.

202.    Defendant had a duty to keep the Private Information safe and secure under the
FTCA and regulations promulgated thereunder and MASS. GEN. LAWS ch. 93H, §2 and
regulations promulgated thereunder.

203.    Defendants failed to adequately protect and secure the Private Information.

204.    Defendants failed to comply with their obligations to protect and secure the Private
Information under the FTCA and regulations promulgated thereunder and MASS. GEN. LAWS
ch. 93H, §2 and regulations promulgated thereunder.

205. Defendant failed to comply with industry standards for the protection and security of the Private Information.

206. Defendant failed to comply with its own privacy practice relating to the protection and security of the Private Information.

207. Criminals were able to access Private Information through the Data Breach.

208. Defendants had a duty to timely notify customers, including Plaintiffs and the Class, of the Data Breach under 45 C.F.R. §164.404 and MASS. GEN. LAWS ch. 93H, §3, the Massachusetts Security Breach statute.

209. Although it was aware of the Data Breach, Defendant failed to timely notify its patients of the breach, including Plaintiffs and members of the Class.

210. The aforementioned actions and omissions constitute unfair or deceptive acts or practices.

211. As a result of the aforementioned actions and omissions, Plaintiffs and members of the Class have suffered, and will continue to suffer, injury in an amount to be determined at trial, including, but not limited to: the loss of the benefit of their bargain with Defendants; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses incurred protecting themselves from fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud and identity theft.

212. As a result of the aforementioned actions and omissions, Plaintiffs and the Class seek their actual damages, statutory damages, treble damages, punitive damages, their costs and reasonable attorneys' fees, and any injunctive or equitable relief needed to secure Private Information in the possession, custody, and control of Defendants and their agents.

213.    A demand identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered was mailed or delivered to Defendants at least thirty days prior to the filing of a pleading alleging this claim for relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, as applicable, prays for and respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

a.    That the Court certify this action as a class action, proper and maintainable pursuant to M.G.I. c. 149, §150, and Mass. R. Civ. P. 23; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' counsel as Class Counsel;

b.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

c.    Awarding Plaintiffs and the Class equitable and injunctive relief, as may be appropriate.  Plaintiff, on behalf of themselves and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard Personal Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

d.    That the Court award Plaintiffs and Class Members compensatory, consequential, and general damages in an amount to be determined by a jury at trial;

e.    That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of its unlawful acts,

46

omissions, and practices;

f.   That the Court award statutory damages, trebled, and punitive or exemplary

     damages, to the extent permitted by law;

g.   That the Court award to Plaintiffs the costs and disbursements of the action, along

     with reasonable attorneys' fees, costs, and expenses;

h.   That the Court award pre-and post-judgment interest at the maximum legal rate;

     and

i.   That the Court grant all such other relief as it deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demands a jury trial on all claims so triable.

Dated: October 5, 2023

<div style="margin-left:40%">

/s/ D. Greg Blankinship
D. Greg Blankinship (BBO# 655430)
Todd S. Garber (*pro hac vice application
forthcoming*)
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
gblankinship@fbfglaw.com
tgarber@fbfglaw.com

</div>